Filed 5/21/24  P. v. Collins CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B324125 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA395459) |
| v. | |
| ARTERO COLLINS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Adrian K. Panton, under appointment by the Court of Appeal,  for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

In 2013, a jury convicted Artero Collins of first degree murder and premeditated attempted murder with true findings on gun and gang allegations. Years later, the trial court held a resentencing hearing to consider the impact on Collins's judgment of new laws, including Assembly Bill No. 333, which changed the law on gang enhancements. Collins was at the resentencing hearing, and the trial court dismissed the gun and gang enhancements but declined to grant Collins a new trial on the substantive offenses. The trial court also declined to strike five-year priors. The trial court then held a second resentencing hearing at which Collins was not present. At that second resentencing hearing, the trial court reconsidered its position regarding the five-year priors and struck them. Collins appeals, contending that reversal is required because he was not at the second resentencing hearing and because admitting gang evidence prejudiced him on the substantive offenses. We disagree that prejudicial error occurred and affirm the judgment.

## BACKGROUND

I.     The evidence at Collins's trial for murder

The factual background is from the Court of Appeal opinion affirming the judgment of conviction against Collins on direct appeal, *People v. Collins* (Aug. 24, 2017, B262755) [nonpub. opn.].

"A.     Gas Station Shootings

"On July 5, 2010, at about 3:30 a.m., Keith Campbell pulled his BMW into a gas station at the intersection of Western and Vernon Avenues. Campbell's cousin Chad Andrew was riding in the front passenger seat. Campbell got out of the car and walked to the station's cashier window, while Andrew remained seated in the BMW.

"As Campbell walked to the cashier window, he noticed two men approaching him; they were wearing red and had what Campbell called a 'vicious attitude.' The men asked Campbell, 'Where you from?' and he did not respond. Instead, Campbell turned around and ran back to his car, yelling for Andrew to get out of the car and run away.

"Campbell entered the back seat of the BMW as Andrew tried to leave the car. As this occurred, the two men in red began shooting. Campbell was shot twice, once in the chest and once in the shoulder. Andrew, who had managed to exit the car, was shot several times and killed. After the shots were fired, the shooters ran from the gas station. Campbell called 911 on his cell phone, and the recording of his call was played at trial.

"Police officers promptly responded to the shooting scene. They found Campbell's BMW at a gas pump, with a broken window. They also found a man on the ground who was unconscious and not breathing (Andrew), and another man with several gunshot wounds who was pacing nearby (Campbell). Campbell testified he did not get a good look at the shooters and could not identify them, but he did give a description of the shooters to police.

"Detectives arrived at the scene and collected evidence. They found 22 expended nine-millimeter casings, two bullet fragments, and two fired bullets in the area outside the BMW; they also found several live rounds, two expended casings, and a bullet fragment inside the BMW. The gas station's surveillance video was recovered, and it displayed portions of the shooting sequence. The video was introduced into evidence and was played for the jury several times during the course of the trial.

"A police criminalist reviewed all the firearms evidence and concluded that at least three firearms were used. A police firearms expert examined the bullet strike marks on the BMW, the location of expended casings, and the gas station surveillance video. He concluded that multiple shots were fired into the BMW, and shots were also fired from inside the car. Campbell, however, testified that he did not have a gun and did not shoot back at the men who fired at Andrew and him.

"A custodian of records for Metro PCS testified about cellular telephone calls at the gas station where the shootings occurred. He authenticated records for a prepaid cell phone registered in the name of 'Cirturo Collins.' On July 5, 2010 at 3:38 a.m., that phone received an incoming call from the number 323-338-9360. The call was transmitted through a cellular tower that was located about 120 feet from the gas station. At 3:50 a.m. that morning, the same cellular tower transmitted an outgoing emergency call to 911 from a different phone.

"B.    Detentions and Arrests

"On July 5, 2010, at about 4:10 a.m., Sheriff's Department dispatcher Joshua Gomez was working at Harbor UCLA Hospital and watching a security monitor. He noticed three men entering the emergency room with appellant, who appeared to be wounded. All of the men were wearing red and looked scared. The three men left appellant and ran away to a grey four-door Chevy Malibu. Gomez saw the Malibu's license number and radioed a description of the men and their car.

"Deputy Sheriff Daniel Perez stopped the Malibu on hospital grounds. He saw three men in the car, and noticed the front passenger placing something into the center console area; Perez later searched the car and found a revolver in the console

4

area. The men in the Malibu identified themselves as Dontrell Williams, Irving Holloway, and Mylik Birdsong. Williams told deputies he was a Black P-Stone gang member, and deputies later determined that Williams also went by the name Isiah Wheeler.

"Appellant received treatment at the Harbor UCLA Hospital on the morning of July 5, 2010, shortly after he was dropped off by the others. The treating physician testified that appellant had a through-and-through gunshot wound to his left thigh.[1] When the physician asked him about the wound, appellant said he had been shot in the left thigh 30 minutes before he came to the hospital, and he had filed a report with the police at a 'gas station.' Appellant was treated for the wound and released from the hospital the same morning.

"Mylik Birdsong was arrested in relation to the Campbell and Andrew shootings in March 2012. At the time of his arrest, detectives monitored a telephone call that he made from county jail. Based on statements made during the call, appellant's jail cell was searched and three cell phones were found. A detective examined the cell phones and found photographs of appellant and others, which were shown to the jury and considered by the prosecution's gang expert during his testimony.

"C.    Gang Evidence

"Officer Phil Rodriguez testified for the prosecution as an expert concerning the Black P-Stone gang. At the time of trial, Rodriguez had been a police officer for nine years and had gang

---

[1]    "In the gas station surveillance video, one of the shooters appears to have been struck by a bullet in the left thigh."

experience throughout his career. For seven years he served in the Southwest Division gang detail and had continuous experience with all gangs in the area, including the Black P-Stones. Rodriguez was a senior officer in the gang detail.

"Rodriguez had extensive experience with the Black P-Stones. He had testified in more than 80 Black P-Stone gang cases, and he had 'over a couple thousand' contacts with Black P-Stone members. As a senior gang officer, Rodriguez provided training on the Black P-Stone gang to federal and local law enforcement agencies.

"Rodriguez testified the Black P-Stone gang is a clique of the larger Blood gang, and it has adopted red as its primary color. At the time of trial there were over 1,000 Black P-Stone gang members in Los Angeles County, and the gang claimed territory in two areas of lower Baldwin Hills. Rivals of the Black P-Stones included the Rollin' 40's gang, which claimed territory that included the gas station where Campbell and Andrew were shot.

"Rodriguez testified the primary activities of the Black P-Stone gang included robberies, assault with deadly weapons, murders, attempted murders, extortion, rape, carjacking, and narcotic sales. During his testimony, he explained the benefits to the gang from violent crimes committed by its members (instilling fear in the community and deterring reports to law enforcement and testimony in court), and he described the hierarchy for committing gang crimes (older 'generals' directing younger 'soldiers' to put in work that benefits the gang). Rodriguez explained that murder and other violent crimes against rivals can benefit the gang by showing others that the gang is violent and by enhancing the reputation of the 'soldiers' who commit the crimes.

"Rodriguez stated his opinion that appellant was 'absolutely' a member of the Black P-Stones gang.  Rodriguez said he was personally familiar with appellant, who used the moniker 'Papi.'  Rodriguez had at least two personal contacts with appellant; he was present when appellant was served with a gang injunction, and when appellant was in court on another occasion.[2]  Rodriguez reviewed photographs of appellant's tattoos, which had references to the Black P-Stones and disrespectful references to the Crips.  Rodriguez also reviewed photos of appellant, which showed him posing and flashing gang signs with individuals that Rodriguez knew as Black P-Stone members.  Rodriguez based his opinion of appellant's gang membership on his personal interactions with appellant, as well as appellant's admission of Black P-Stone membership, Black P-Stone tattoos, arrests with Black P-Stone members, presence at Black P-Stone locations, and photos with other members of the gang.

"Rodriguez testified that the three men who brought appellant to the hospital on the night of the shootings were also active members of the Black P-Stone gang:  Birdsong, whose moniker was 'Little Papi'; Williams, whose moniker was 'Nook'; and Holloway, whose moniker was 'T-Roll.'  Rodriguez said he was familiar with all three men through prior contacts and arrests, and he knew that all three were self-admitted and

---

[2]     "The transcript is somewhat confusing, as it suggests that Rodriguez had more than two personal interactions with appellant.  It quotes Rodriguez as stating:  'I believe I have had contact with defendant Collins on two occasions.  Two in the lower Baldwin Village on a traffic stop; one where he was–I was present where he was served a gang injunction.  And the other was a court hearing at Torrance court.' "

7

documented members of the gang.  Rodriguez explained that Birdsong's moniker 'Little Papi' and appellant's moniker 'Papi' reflected a younger gang member who looked up to an older gang member and took a modified moniker to demonstrate his respect.

"Rodriguez was given a hypothetical question that mirrored the prosecution's evidence.  In response, Rodriguez stated his opinion that the shootings were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members.  Rodriguez explained that such a crime would serve the goals of reducing the number of rival gang members, instilling fear and intimidation in the community, elevating the status of the gang, and helping with recruitment of new gang members.

"D.    Defense Evidence

"Diona Floyd was the sole witness called by the defense.  Floyd testified that she and appellant attended a party on July 4, 2010, at Jim Gilliam Park in the lower Baldwin Hills area.  There were approximately 30 to 50 people at the gathering, drinking and watching fireworks.  Around 1:00 a.m. or 2:00 a.m., gunshots were fired from a passing car; everybody ran and Floyd noticed that appellant had been shot in the leg.  Shortly after the shooting, appellant got into a car with other men and they drove away.

"Floyd admitted that she loved appellant and had written him a love letter while he was in custody.  She said the 323-338-9360 telephone number which called the cell phone registered to 'Cirturo Collins' on July 5, 2010 sounded familiar to the number she used at that time.  Floyd admitted she had a felony record

8

and was then in custody for a probation violation." (*People v. Collins*, *supra*, B262755.)

## II. Jury's verdict and sentence

A jury convicted Collins of first degree murder (Pen. Code,[3] § 187, subd. (a)), and attempted premeditated murder (§§ 664, 187, subd. (a)). The jury found true principal gun use (§ 12022.53, subds. (b), (c), (d) & (e)(1)) and gang (§ 186.22, subd. (b)(1)(C)) allegations. The trial court found that Collins had two prior convictions within the meaning of the Three Strikes Law (§§ 667, subds. (b)–(i) & 1170.12, subds. (a)–(d)) and that Collins had two prior convictions under section 667, subdivision (a). In 2015, the trial court sentenced Collins to an indeterminate term of 150 years to life plus two 5-year terms under section 667, subdivision (a).

This Division affirmed the judgment of conviction in *People v. Collins*, *supra*, B262755.

## III. Collins's petition for writ of habeas corpus and resentencing hearings

In November 2019, Collins petitioned for a writ of habeas corpus in the California Supreme Court, arguing, among other things, that his counsel had provided ineffective assistance by failing to raise on direct appeal Senate Bill No. 620, which gave trial courts discretion to strike firearm enhancements. The California Supreme Court issued an order to show cause returnable in the trial court. In the trial court, the parties agreed that Collins was entitled to a sentencing hearing so that the trial

---

[3]     All further undesignated statutory references are to the Penal Code.

9

court could consider whether to strike the firearm enhancements. Meanwhile, our Legislature had passed Assembly Bill No. 333, which amended the gang enhancement statute, section 186.22. Collins's counsel therefore filed a motion for a new trial, arguing that Collins was entitled to relief under that new law.

A. *The first resentencing hearing*

On August 31, 2022, the trial court held an evidentiary and resentencing hearing at which Collins was present.[4] The trial court considered three issues: (1) whether it should grant relief under Assembly Bill No. 333, (2) whether it should strike a prior strike conviction under *Romero*[5]; and (3) whether it should dismiss the section 667, subdivision (a), enhancements.

First, the trial court granted the motion for new trial as to the gang and gun enhancements but denied it insofar as it sought retrial of the substantive offenses, finding that gang evidence would have been admitted at trial to establish motive and identity, and the gang evidence was not unduly prejudicial. When the People could not proceed on the gang and gun enhancements, the trial court granted the People's motion to dismiss them.

Second, the trial court considered the *Romero* motion. According to the prosecutor, one of Collins's strikes arose out of his shooting a neighbor after an argument, and the second strike arose out of Collins shooting a security guard. Defense counsel asked the trial court to consider Collins's mental health issues

---

[4] The hearing had been continued from an earlier date because Collins wanted to be present.

[5] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

under section 1385, noting that counsel had filed sealed records concerning those issues. Defense counsel argued that at least one prior strike should be stricken because Collins was a youthful offender (he was 18 years old when he committed the crimes) and, further, that Collins's mental health had to be considered. Collins's mother then testified that Collins's father was not present during his childhood, and she was busy working. Bigger kids "jumped" Collins, took his belongings, and "put a knife to him." Collins also saw his mother's boyfriend beat her, and Collins once discovered a dead body. When Collins was in the fifth or sixth grade, his mother noticed that he became angry and fearful.

The trial court noted that Collins committed his first strike (attempted murder) when he was 18 years old, but had been in and out of the criminal system since he was about 12 years old. Although Collins spent time in custody for the attempted murder, he "didn't learn his lesson," because shortly after being released, he committed an assault with a firearm in 2010. Just a couple of months later, Collins committed the current crimes. The trial court found that Collins, now 26 years old, was the same person he was at 18, and it denied the *Romero* motion.

Finally, the trial court also declined to strike the two section 667, subdivision (a), enhancements. Although the trial court acknowledged Collins's mental health issues,[6] it found that striking the enhancements would endanger the public and that defendant was "almost like a poster child of why these are in place with regard to the most dangerous of the dangerous." The

---

[6] The trial court said it would not explain Collins's mental health issues in open court out of respect for him, but it had considered them.

trial court further noted that while Collins got his GED in 2017, completed a nine-day computer literacy course, had sporadically attended a college class, and had submitted three "Milestone Completion" documents and a positive "Work Supervisor's Report," he needed to do more. The trial court therefore resentenced Collins to an indeterminate term of 100 years to life plus a determinate term of 10 years for the two section 667, subdivision (a), priors.

B. *The second resentencing hearing*

On September 20, 2022, the trial court held a second resentencing hearing. Defense counsel stated that Collins "has waived his presence." The trial court acknowledged it had previously declined to strike the two section 667, subdivision (a), enhancements. But "upon further reflection," the trial court thought that striking them served the interest of justice based on Collins's age and that the crimes were used to impose a Three Strikes sentence. In response, the prosecutor objected but otherwise submitted. Defense counsel declined to be heard. The trial court therefore sentenced Collins to 100 years to life.

## DISCUSSION

I.    The resentencing hearing

Collins contends that he did not waive his presence at the September 2022 resentencing hearing at which the trial court struck the five year priors, and therefore reversal is required. As we now explain, we do not agree that any error prejudiced Collins.

A criminal defendant has a constitutional and statutory right to be personally present at various proceedings, including imposition of sentence, sentence modification, and resentencing.

(See generally §§ 977, 1043; *People v. Sandoval* (2015) 62 Cal.4th 394, 431; *People v. Basler* (2022) 80 Cal.App.5th 46, 57.)  As particularly relevant here, section 977, subdivision (b)(1), provides that in all felony cases, the accused shall be personally present at proceedings, including at the "imposition of sentence." Under that section, defendants may waive their right to be physically present, and the waiver must be voluntary, knowing, intelligent, and "in writing and filed with the court or, with the court's consent, . . . entered personally by the defendant or by the defendant's counsel."  (§ 977, subd. (b)(2); *Basler*, at pp. 57–58.) "A defendant's personal waiver of the right to be physically or remotely present shall be on the record and state that the defendant has been advised of the right to be physically or remotely present for the hearing at issue and agrees that notice to the attorney that the defendant's physical or remote presence in court at a future date and time is required is notice to the defendant of that requirement."  (§ 977, subd. (b)(2)(A).)

Or, counsel may enter a waiver of the client's physical presence, "after counsel has stated on the record that the defendant has *been advised of the right to be physically or remotely present* for the hearing at issue, has waived that right, and agrees that notice to the attorney that the defendant's physical or remote presence in court at a future date and time is required is notice to the defendant of that requirement."  (§ 977, subd. (b)(2)(B), italics added; see, e.g., *People v. Quan* (2023) 96 Cal.App.5th 524, 534–535 [counsel's representation he had authority to appear on defendant's behalf under § 977, subd. (b), insufficient to waive defendant's presence].)

Here, Collins's counsel stated at the September 2022 resentencing hearing that Collins "had waived his presence."

13

Counsel did not, however, state that she had advised Collins of his right to be present. Collins accordingly now argues that the waiver was inadequate, so resentencing him in his absence violated his constitutional and statutory right to be present at sentencing.

We will assume, without deciding, that an error occurred. Nonetheless, any error was harmless, whether evaluated under the harmless beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18, 24, applicable to federal constitutional error, or under the reasonable probability standard in *People v. Watson* (1956) 46 Cal.2d 818, 836, applicable to state law statutory error. (See generally *People v. Davis* (2005) 36 Cal.4th 510, 532, [under federal Constitution, error pertaining to defendant's presence is evaluated under *Chapman*'s harmless-beyond-a-reasonable-doubt standard]; *People v. Weaver* (2001) 26 Cal.4th 876, 968 [statutory error under § 977 is reversible only if it is reasonably probable a more favorable result would have been reached in error's absence].)

It is unclear what more favorable result Collins could have obtained had he been at the September 2022 resentencing hearing. At the August 2022 resentencing hearing, the trial court struck all firearm enhancements, thereby reducing his indeterminate term by 50 years to life. Then, at the September 2022 resentencing hearing, the trial court struck the section 667, subdivision (a), five-year priors, eliminating the 10-year determinate term. It is therefore unclear how else the trial court could have favorably modified Collins's sentence, other than to reconsider its denial of the *Romero* motion. But, as to that, the trial court had previously explained why it would not strike the prior strikes, and, at the September 2022 hearing, reiterated that

14

it was striking the five year priors *because* it had used them to impose the Three Strikes sentence. By this, the trial court reaffirmed its intent to impose a Three Strikes sentence on the substantive offenses.

Collins asserts, however, that had he been at the September 2022 resentencing hearing, he could have elaborated on his educational deficiencies that the trial court had discussed at the August 2022 hearing, when it initially refused to strike the enhancements. That is, at the August 2022 hearing, the trial court cited Collins's sparse academic accomplishments in prison, and said he needed to do more. Collins was at the August 2022 hearing, but neither he nor his counsel responded to the trial court's observation. (See, e.g., *People v. Robertson* (1989) 48 Cal.3d 18, 62 [defendant's absence without proper waiver from sentencing hearing harmless where he'd previously addressed court about his crimes].) Collins does not suggest how he could have elaborated on this issue at the subsequent September 2022 hearing, and his counsel, when asked if she had anything to add at that hearing, said she did not. (Compare *People v. Quan*, *supra*, 96 Cal.App.5th at pp. 534–537 [defendant's absence from § 1172.6 evidentiary hearing not harmless because he could have offered testimony or evidence], with *People v. Nieves* (2021) 11 Cal.5th 404, 509 [defendant's absence from restitution hearing harmless beyond a reasonable doubt where nothing in record indicated she would have added information about her ability to pay beyond that presented by defense counsel].)

We therefore conclude that any error in obtaining a proper waiver of Collins's presence at the September 2022 resentencing hearing was harmless.

II.     The gang enhancement

Collins contends that the trial court's refusal to grant a retrial on the substantive offenses violated his due process right to a fundamentally fair trial under recently enacted section 1109, which applied retroactively to him. After discussing Assembly Bill No. 333, which added section 1109, we reject this contention, finding any error in admitting gang evidence harmless.

A. *Assembly Bill No. 333*

Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) became effective on January 1, 2022. It changed the law on gang enhancements and enacted section 1109 to require bifurcation at trial of gang enhancements. First, Assembly Bill 333, "narrowed the definition of a 'criminal street gang' to require that any gang be an 'ongoing, *organized* association or group of three or more persons.' (§ 186.22, subd. (f), italics added.) Second, whereas section 186.22, former subdivision (f) required only that a gang's members 'individually *or* collectively engage in' a pattern of criminal activity in order to constitute a 'criminal street gang,' Assembly Bill 333 requires that any such pattern have been '*collectively* engage[d] in' by members of the gang. (§ 186.22, subd. (f), italics added.) Third, Assembly Bill 333 also narrowed the definition of a 'pattern of criminal activity' by requiring that (1) the last offense used to show a pattern of criminal gang activity occurred within three years of the date that the currently charged offense is alleged to have been committed; (2) the offenses were committed by two or more gang 'members,' as opposed to just 'persons'; (3) the offenses commonly benefitted a criminal street gang; and (4) the offenses establishing a pattern of gang activity must be ones other than

16

the currently charged offense.  (§ 186.22, subd. (e)(1), (2).)
Fourth, Assembly Bill 333 narrowed what it means for an offense
to have commonly benefitted a street gang, requiring that any
'common benefit' be 'more than reputational.'  (§ 186.22,
subd. (g).)  [¶]  Finally, Assembly Bill 333 added section 1109,
which requires, if requested by the defendant, a gang
enhancement charge to be tried separately from all other counts
that do not otherwise require gang evidence as an element of the
crime.  If the proceedings are bifurcated, the truth of the gang
enhancement may be determined only after a trier of fact finds
the defendant guilty of the underlying offense." (*People v. Tran*
(2022) 13 Cal.5th 1169, 1206 (*Tran*).)

Courts of Appeal are divided on whether section 1109
applies retroactively, and the issue is pending review in the
California Supreme Court.  (See e.g., *People v. Burgos* (2022)
77 Cal.App.5th 550, 566–567, rev. granted July 13, 2022,
S274743 [§ 1109 applies retroactively]; *People v. Ramos* (2022)
77 Cal.App.5th 1116, 1131 [same]; contra, *People v. Ramirez*
(2022) 79 Cal.App.5th 48, 65, rev. granted Aug. 17, 2022,
S275341 [§ 1109 does not apply retroactively]; *People v. Perez*
(2022) 78 Cal.App.5th 192, 207, rev. granted Aug. 17, 2022,
S275090 [same]; *People v. Boukes* (2022) 83 Cal.App.5th 937,
rev. granted Dec. 14, 2022, S277103 [same].)  The California
Supreme Court declined to decide the retroactivity issue in *Tran*,
*supra*, 13 Cal.5th at page 1208.  Instead, the court found that any
error in not bifurcating a gang allegation under section 1109 is
subject to harmless error analysis under *People v. Watson*, *supra*,
46 Cal.2d 818.  (*Tran*, at p. 1209.)  The court also recognized that
evidentiary errors result in a due process violation only where
they render trial fundamentally unfair.  (*Ibid.*)

17

As did the court in *Tran*, we decline to address in this case whether section 1109 is retroactive. Instead, we find that any error in not bifurcating the gang enhancement for trial was harmless and did not render Collins's trial fundamentally unfair.

B. *Any error in admitting gang evidence was harmless*

Assembly Bill 333 does not limit admission of gang evidence where it is relevant to the underlying charges. (*People v. Ramos*, *supra*, 77 Cal.App.5th at p. 1132; see *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) Thus, "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to the guilt of the charged crime." (*Hernandez*, at p. 1049.)

Here, gang evidence was relevant to explain practices employed during the events, motive, and intent. As to practices, gang evidence gave context to the encounter between Campbell and the shooters. (See, e.g., *People v. Duong* (2020) 10 Cal.5th 36, 64 [gang affiliation evidence gave context to shooting].) Campbell said two men in red approached him at the gas station with a "vicious attitude" and asked, "Where are you from?" Gang evidence explained what that odd question might mean. The gang expert explained that the question "is another form of banging," showing that the two men were seeking rival gang members who were "slipping."[7] Stated otherwise, the question provides the opportunity to "fade," meaning to initiate a violent confrontation.

---

[7] The expert did not define "slipping."

18

Gang evidence was also relevant to prove the shooters' identities; that is, that they were likely members of the Black P-Stones. The crimes occurred in territory claimed by the Black P-Stones's rival, the Rollin' 40's. As the gang expert explained, gangs go into a rival's territory to commit crimes. The shooters wore red, a color associated with the Black P-Stones, and wearing that color in a rival's territory signals your gang affiliation. Collins was a self-admitted Black P-Stone. The three men who took Collins to the hospital after the shooting were fellow Black P-Stone gang members. Indeed, one, Birdsong, had a moniker of Little Papi, a modified version of Collins's moniker, Papi, showing that they had a close relationship. Thus, evidence that the shooting occurred in rival gang territory, that the shooters wore red, and that the men who took Collins to the hospital were all Black P-Stone gang members tended to identify the shooters as Black P-Stone gang members. (See, e.g., *People v. Ramirez* (2022) 13 Cal.5th 997, 1095–1096 [proof that defendant and another suspect belonged to same gang formed significant evidentiary link in chain of proof tying them to crimes].)

Finally, gang evidence was relevant to establish motive. (See generally *People v. Chhoun* (2021) 11 Cal.5th 1, 32 ["motive can illuminate intent"].) The gang expert testified that the Black P-Stone and Rollin' 40's gangs are rivals and that gangs instill fear in community members to make them less likely to report crimes. This testimony helped explain why the shooting occurred. The shooting occurred in Rollin' 40's territory. A gang challenge—"Where are you from?"—preceded the shooting. This question, asked by men in red with vicious attitudes, was enough to prompt Campbell to run away and to yell to Andrew to get out of the car. The gang evidence therefore explained why two

19

strangers would approach Campbell angrily and ask where he was from: they were initiating a gang confrontation. (See, e.g., *People v. Duong*, *supra*, 10 Cal.5th at p. 65 [gang evidence explained defendant's willingness to shoot complete stranger after verbal spat].)

And even if some gang evidence—for example, the predicate crimes and evidence of the pattern of crimes—should not have been admitted at the guilt phase of Collins's trial, the nongang evidence of his guilt was overwhelming and compelling. (See, e.g., *People v. Session* (2023) 93 Cal.App.5th 723, 735 [no reasonable probability that any reasonable jury would have reached different result had gang evidence been excluded, where evidence of guilt was overwhelming]; *People v. E.H.* (2022) 75 Cal.App.5th 467, 480 [where evidence of guilt on underlying charge is overwhelming, unlikely that trial format harmed defendant].)

First, the shooting occurred at about 3:50 a.m., and surveillance video from the gas station appears to show a bullet striking one shooter in the left thigh. About 30 minutes later, three men dropped Collins off at UCLA Harbor Hospital, where Collins was treated for a gunshot wound to his left thigh. Further, the men who dropped Collins off at the hospital did not stay with him, suggesting that they did not want to be identified or seen with Collins.

Second, Collins *admitted* to a doctor that he had been shot 30 minutes earlier and had filed a report with police *at a gas station*. This could be viewed as an admission he was shot at a gas station.

Third, a cell phone registered to Cirturo Collins was in the vicinity of the shooting when it occurred. Collins's girlfriend

20

admitted that a cell phone number belonging to her called Cirturo Collins's cell phone at 3:38 a.m., when Cirturo Collins's cell phone was in the vicinity of the shooting. (See, e.g., *People v. Session*, *supra*, 93 Cal.App.5th at p. 735 [that defendant's cell phone was at locations of burglaries was a factor in evaluating harmless error].)

In sum, cell phone evidence placed Collins at or near the crime scene when Campbell and Andrew were shot, Collins's injury matched what happened to a shooter per the video surveillance, the timing of Collins's injury and arrival at the hospital coincided with the timing of the shooting, and Collins's own statements placed him at the shooting. We therefore conclude that it is not reasonably probable Collins would have obtained a more favorable result in the absence of any gang evidence.[8] (See generally *Tran*, *supra*, 13 Cal.5th at pp. 1209–1210.)

For similar reasons, admitting gang evidence did not render Collins's trial fundamentally unfair. As we have said, the prosecution relied on evidence other than gang evidence to establish Collins's guilt on the underlying charges of murder and attempted murder. That evidence was compelling, especially

---

[8]   In addition, the trial court instructed the jury with CALCRIM No. 1403, that gang evidence was admitted for the limited purpose of whether Collins acted with the intent, purpose, and knowledge required to prove the gang allegation and whether he had motive to commit the crimes charged. The jury was also permitted to consider gang evidence to evaluate a witness's credibility and the facts and information the expert witness relied on in reaching his opinion. We presume that the jury followed that instruction. (*People v. Chhoun*, *supra*, 11 Cal.5th at p. 30.)

21

Collins's statements to the doctor essentially admitting he had just been shot at a gas station.  In contrast, gang evidence was used to establish motive for the crimes and the participants' identity.  Because gang evidence was relevant to the underlying charges but was not the primary evidence of guilt, its admission did not render Collins's trial fundamentally unfair.  (See, e.g., *Tran*, *supra*, 13 Cal.5th at pp. 1208–1209; see generally *People v. Partida* (2005) 37 Cal.4th 428, 439.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

22